Ethel OLSON and Lillian Searle, as Co-Administratrices of the Estate of Sarilla L. Whitlock, Deceased

v.

The UNITED STATES, Defendant; BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, Security Pacific National Bank, and Security National Bank of Oakland, Third-Party Defendants.

No. 172–69.

United States Court of Claims.

Feb. 19, 1971.

Robert C. Field, Oakland, Cal., attorney of record, for plaintiffs. David M. Lightner, Los Angeles, Cal., of counsel.

J. Lawrence Heizmann, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Theodore Sachsman, San Francisco, Cal., for Bank of America National Trust and Savings Assn. Neal L. Petersen, San Francisco, Cal., attorney of record. Charles E. Cooper, San Francisco, Cal., of counsel.

Francis C. Highan, Jr., attorney of record for Security Pacific National Bank. Michael H. Smithwick, Los Angeles, Cal., of counsel.

Thomas A. Stark, Walnut Creek, Cal., attorney of record for Security National Bank of Oakland.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

SKELTON, Judge:

This is an action involving a claim against the Check Forgery Insurance Fund under 31 U.S.C. §§ 561, 564 (1964) and 31 C.F.R. §§ 359.0–359.4. Plaintiffs in this suit are the co-administratrices of the estate of Sarilla L. Whitlock, deceased.

In October 1960, Mrs. Whitlock, a widow, who resided in Alameda County, California, fell and injured her hip. Thereafter, she was confined to a convalescent hospital until her death in 1965. On April 28, 1961, John C. Houlihan, her attorney, obtained an order from the Superior Court of California appointing him the conservator of her estate with a security bond of $150,000 being required by the court. On May 25, 1961, Mr. Houlihan had the amount of the bond reduced by the court to $50,-000, on the representation in his petition to the court that he would deposit certain of Mrs. Whitlock's U. S. Savings Bonds with the United California Bank, subject to withdrawal *only* upon order of the court. This supposedly was for the purpose of saving the conservatee approximately fifty percent of the cost of the bond. Among the savings bonds to be deposited were those whose proceeds are involved here. However, Mr. Houlihan failed to deposit the bonds after the court reduced his bond on said condition. Instead he redeemed the bonds without court authorization and without Mrs. Whitlock's knowledge and appropriated the proceeds amounting to $49,802.-50 to his own use.

The bonds were redeemed over a period of time. First, on March 2, 1963, Mr. Houlihan, representing himself as Mrs. Whitlock's attorney, presented for redemption to the American Trust Company (now Wells Fargo Bank) one Series G bond for $5,000 and two Series H bonds, each for $10,000. He gave instructions that the Treasury checks to be issued in redemption of the bonds should be sent to the address of an apartment formerly occupied by Mrs. Whitlock. Pursuant to these instructions, two Treasury checks No. 100898, dated March 29, 1963, in the sum of $5,062.50 and No. 101545, dated May 1, 1963, in the sum of $20,000, were mailed to Mrs. Whitlock at such address. Both checks were thereafter obtained by Mr. Houlihan without Mrs. Whitlock's knowledge or consent and were endorsed by him in blank with an imitated signature of Mrs. Whitlock. They were then separately deposited in Mr. Houlihan's personal account at the Oakland Main Office of the Bank of America. At the time of these deposits, the account was overdrawn in excess of $1,500.

On June 30, 1964, Mr. Houlihan presented for redemption to the Oakland Office of the Wells Fargo Bank three more of Mrs. Whitlock's U. S. Savings Bonds without court order and without the knowledge or consent of Mrs. Whitlock. The bonds presented were two Series H bonds of $10,000 and $5,000, respectively, and one Series K bond of $10,000.

Similar instructions were given this bank concerning the mailing of the Treasury checks. Two Treasury checks, No. 123955, dated August 1, 1964, for $15,000 and No. 123888, dated August 1, 1964, for $9,740, representing the proceeds of the three bonds were issued and mailed to the specified address. Both checks were later obtained by Mr. Houlihan without Mrs. Whitlock's knowledge or consent and were endorsed in blank by him with a forged signature of Mrs. Whitlock. Also, both contained a second endorsement in blank of Mr. Houlihan. Check No. 123955 for $15,000 was deposited with the First National Bank of Oakland in the account of the Estate of John Joseph Betmon, deceased, to cover prior misappropriations by Mr. Houlihan from that estate. The other check in the sum of $9,740 was deposited in Mr. Houlihan's personal account at the Oakland Main Office of the Bank of America at a time when the account was overdrawn by more than $1,600.

The Bank of America, after deposit by Houlihan, presented the three checks Nos. 101545; 100898; and 123888 totaling $34,802.50, to the United States Treasury for payment. Thereafter, these checks were honored and paid by the Treasury. The other check, No. 123955, followed a more involved path. It was negotiated by Mr. Houlihan at the First National Bank of Oakland. The Security National Bank is the successor in interest to said First National Bank of Oakland. This check was presented to the Treasury of the United States for payment by the Pacific National Bank, a later endorsee. The Security Pacific National Bank is the successor in interest to the said Pacific National Bank. Each of the four checks involved bore the endorsement of the presenting bank and check No. 123955 bore the additional endorsement of the First National Bank of Oakland.

Subsequent to Mrs. Whitlock's death in 1965, the heirs of Mrs. Whitlock learned of Mr. Houlihan's mishandling of her estate. On April 28, 1966, an indictment was returned against Mr. Houlihan, who subsequently pleaded guilty to the charge of felony grand theft with reference to Mrs. Whitlock's estate, and was convicted and sentenced to the State Prison for a term of years. In the Grand Jury proceedings, James V. Conway, Federal Postal Inspector and Examiner of Questioned Documents, characterized the endorsements of the four Treasury checks as obvious attempts to imitate the signature of the decedent.

By letter of March 6, 1967, plaintiffs filed a claim with the Treasurer of the United States against the Check Forgery Insurance Fund, claiming that Mr. Houlihan had acted without authority and that pursuant to the provisions of the Check Forgery Insurance Fund, 31 U. S.C. §§ 561, 564 (1964), they were entitled to be reimbursed for the value of the checks that the United States had paid on a forged endorsement by Mr. Houlihan in the sum of $49,802.50. This claim was disallowed by the Treasury on September 27, 1967. Plaintiffs appealed to the Comptroller General who denied their appeal on June 21, 1968. Thereafter, on March 28, 1969, plaintiffs filed their petition with this court. Defendant has filed contingent cross claims against three third-party defendants, the Bank of America, the Security Pacific National Bank (successor in interest to the Pacific National Bank), and the Security National Bank of Oakland (successor in interest to the First National Bank of Oakland), claiming that in the event defendant is liable to plaintiffs, then the government should have judgment over against these three third-party defendants. In this regard, Security Pacific National Bank admitted that under 31 C.F.R. § 360.4, it, as presenting bank, guaranteed to the Treasurer of the United States the genuineness of prior endorsements.

■ To recover from the Check Forgery Insurance Fund, four conditions must be met, as set out in 31 C.F.R. § 359.2, which are: (a) that the check has been lost or stolen without the fault of the payee or special endorsee; (b)

that the check has thereafter been negotiated and paid by the Treasurer on a forged endorsement of the payee's or special endorsee's name; (c) that the payee or special endorsee has not participated either directly or indirectly in the proceeds of such negotiation or payment; and (d) that reclamation has been or may be delayed more than 10 days, or be unsuccessful. It is obvious that prerequisites of recovery (a), (c), and (d) are met. Requirement (b) is in issue in this case. The defendant and third-party defendant, Bank of America, claim that requirement (b) has not been complied with, contending that Mr. Houlihan had authority to sign Mrs. Whitlock's name and therefore Mr. Houlihan's signing of her name was not a forgery. Thus, the decision in this case revolves around the issue of whether Mr. Houlihan, as conservator of the Estate of Mrs. Sarilla L. Whitlock, had the authority to redeem the bonds and to cash the checks issued in redemption thereof.

■ We find that he did not have such authority, both because of the court order reducing the conservatorship bond on the conditions outlined above, and because of California law governing the authority of conservators. The specific order of the court reducing the conservatorship bond was based on Mr. Houlihan's express representations in his petition for reduction of the bond that he would deposit the bonds in the United California Bank of Oakland, "subject to withdrawal *only* upon further order of this Court." Thus, Mr. Houlihan had no authority with respect to the bonds except to deposit them in the United California Bank. He had no authority whatsoever to redeem the bonds except by order of the court. In fact, he had no authority even to have them in his possession. Therefore, the redemption of the bonds and the endorsement of the checks representing the proceeds of the bonds were in direct violation of the conditions upon which the court based its order reducing the bond.

■ Furthermore, Mr. Houlihan had no authority under general California

law governing the authority of conservators to redeem the bonds and endorse the checks representing the proceeds thereof without a court order. The powers and duties of a conservator are set forth in Chapter 4 of Division V of the California Probate Code, Sections 1851 through 1861. Section 1852 defines generally the powers of a conservator. It grants to the conservator the same powers as are given to a guardian plus additional powers which may be exercised only by court order. Section 1852 reads as follows:

> Every conservator of the estate or of the person and estate of a conservatee shall have the powers granted to a guardian of the estate or of the person and estate of an incompetent * * * and, if granted by the court, the additional powers authorized by Sec. 1853 of this code.

Section 1853 provides in pertinent part as follows:

> On the application of the conservator, made at any time, which application may be included in a petition filed pursuant to Sec. 1754 of this code, the court may grant to a conservator of the estate or of the person and estate of a conservatee, * * * the following additional powers, which may be exercised with or without notice, hearings, confirmation, or approval of the court;

> * * * [T]o take, collect and hold the property of the conservatee; to contract for the conservatorship and to perform outstanding contracts and thereby bind the conservatorship estate; * * * to sell at public or private sale; * * * to exchange conservatorship property; * * *

> Said additional powers shall be in addition to general powers of conservators. The granting of said additional powers shall be discretionary with the court. Notice of the hearing of the application therefor, except when the application is included in a petition filed pursuant to Sec. 1754 of this code, shall be given in the manner

provided in Sec. 1200 of this code * * * When additional powers are granted to a conservator, his letters shall state that he has the powers authorized in this section. If such additional powers are granted by a subsequent order, new letters shall be issued and shall state that he has such power or powers as have been granted. * * *

The additional powers listed in Section 1853 are extensive and would seem to give a conservator the authority to redeem his conservatee's bonds, but only on the following conditions. In order to exercise such powers an order of the probate court is required, after application, notice, and hearing. Also, these additional powers must be set forth on the face of the letters of conservatorship. California Probate Code § 1853. These requirements were not complied with and no such additional powers were granted to Mr. Houlihan by the court. Furthermore, no such additional powers were set forth on the face of the letters of conservatorship. Therefore, Mr. Houlihan derived no authority from section 1853.

As shown above, the powers to take, collect, and hold the property of the conservatee; to sell conservatorship property; and to exchange conservatorship property are powers specifically enumerated for conservators under the additional powers provision of section 1853. We think these provisions are controlling because they cover the specific acts of Houlihan in redeeming the bonds and cashing the checks. Therefore, we do not need to consider the general powers granted to a conservator under section 1852 and related sections of the California Probate Code dealing with the general powers of a guardian. The clear import of sections 1852 and 1853, read together, is that the general powers given by section 1852 do not encompass the powers listed specifically under section 1853. In other words, powers would not be given under section 1853 if they had already been granted in section 1852. Thus, since the authority to redeem

bonds and cash checks is derived from section 1853, it cannot be derived from section 1852. However, even if we examine the guardianship provisions incorporated by section 1852, they do not aid the defendant, as will be shown below.

The general powers and duties of a guardian are found in Division IV, Chapters 7 and 8 of the California Probate Code, Sections 1500 through 1540. None of these sections give a guardian the right to sell or redeem bonds and to cash the checks issued in payment thereof without a court order or without court approval. In fact, the sections in point specifically require court approval. Section 1530 reads in part as follows:

If the income of an estate under guardianship is insufficient for the support, maintenance and education of the ward * * * or if the personal estate and the income from the real estate is insufficient to pay his debts, or if it is for the advantage, benefit, and best interest of the estate or ward * * *. [H]is guardian may sell any of his real or personal property, or mortgage or give a deed of trust upon any of his real property for any such purposes, *subject to authorization, confirmation or direction by the court as hereinafter provided.* [Emphasis supplied.]

Not only did Mr. Houlihan fail to obtain court authorization, but it also appeared that there was no insufficiency of income for the support of Mrs. Whitlock as a basis for such authorization as contemplated by the statute. Likewise, an exchange of property by the conservator, acting under general guardianship powers would require court approval under section 1540, which reads in part:

When property can be exchanged to the advantage and best interest of the ward and such members of his family as he is legally bound to support and maintain, *after hearing before the court,* conveyances to effectuate such exchange may be executed to the person with whom such exchange is made, by the guardian * * *. [Emphasis supplied.]

■ California Appellate Courts have interpreted the law to mean that court approval is necessary to give a guardian authority to sell the property of his ward. In Katz v. Greeninger, 96 Cal. App.2d 245, 215 P.2d 121 (1950), the court said, "While the guardian has the right of possession and control, the property is said to be 'in custodia legis' and subject to the orders of the court." [*Id.* at 124.] The court there adopted the view that a guardian is without power, in the absence of a court order, to withdraw funds from the ward's estate if the withdrawal is not needed for the support of the ward. Redemption of the bonds in the present case was not needed for the support of Mrs. Whitlock. Her average monthly income during the conservatorship proceeding was $850, while the average monthly expenditures were $500. The court in *Katz*, though, went further in saying, "But even in those cases which permit a withdrawal for maintenance the better reasoned ones tie the power of the guardian to the supervision and control of the court." [Id. at 124.] Also, in Guardianship of Wood, 193 Cal.App.2d 260, 14 Cal. Rptr. 147, 151 (1961), the court stated, "If the income from the ward's property then became insufficient for the ward's support and maintenance, the guardian's remedy consisted of an application to the court; she could sell any of the ward's real or personal property '*subject to authorization, confirmation or direction by the court*' * * *." (Probate Code § 1530.)

■ The foregoing authorities demonstrate that under California law, Mr. Houlihan, as conservator, had no authority without a court order or confirmation to redeem the savings bonds of his conservatee and to endorse the conserva-tee's name on the checks representing the proceeds from such bonds. Not only did Mr. Houlihan fail to obtain court approval for the redemption of the bonds, but also he acted in direct violation of the condition under which the court reduced the conservatorship bond. Therefore, his imitation of Mrs. Whitlock's signature was clearly a forgery—satisfying requirement (b) of the Check Forgery Insurance Fund statute. Thus, the facts of this case clearly support the plaintiffs' claim, as all four of the prerequisites for recovery from the Check Forgery Insurance Fund are met. Plaintiffs' motion for summary judgment is granted and judgment is entered in favor of the plaintiffs against the United States in the sum of $49,802.50.

■ The United States is entitled to judgment over against the Third Party Defendant Banks. These banks by endorsing and presenting the checks to the Treasurer for payment guaranteed to the Treasurer that all prior endorsements were genuine. This was true whether or not an express guarantee was placed on the check.[1] This is unequivocally set out in 31 C.F.R. § 360.4 (1970):[2]

§ 360.4 *Guaranty of Indorsements.*

The presenting bank and the indorsers of a check presented to the Treasurer for payment are deemed to guarantee to the Treasurer that all prior indorsements are genuine, whether or not an express guaranty is placed on the check. When the first indorsement has been made by one other than the payee personally, the presenting bank and the indorsers are deemed to guarantee to the Treasurer, in addition to other warranties, that the person who so indorsed had unqualified capacity and authority to in-

---

1. In this case an express guarantee was placed on each of the checks. The three checks presented by the Bank of America contain the legend "PAY AN BANK-P.E.G.-BANK OF AMERICA." The check presented by Pacific National Bank contains the same legend over the endorsement of the First National Bank of Oakland and Pacific National Bank. "P.E.G." is a standard abbreviation for "prior endorsements guaranteed."

2. This provision is basically the same as 31 C.F.R. § 360.2 (1959) which was in effect when the checks in issue were negotiated.

dorse the check in behalf of the payee.[3]

In regard to this, Security Pacific National Bank stated:

> Under the provisions of 31 C.F.R. 360.4 Security Pacific National Bank, as presenting bank, and Security National Bank, as endorser, both guaranteed to the Treasurer of the United States the genuineness of prior endorsements. * * *

It was stated in National Metropolitan Bank v. United States, 323 U.S. 454, 65 S.Ct. 354, 89 L.Ed. 383 (1945), that the Treasury Regulations have made the guarantee of prior endorsements by a presenting bank a prerequisite to payment. Also, in that case the Supreme Court in speaking of its prior holding in Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943) said:

> * * * There we held that presentation of a government check to it for payment with an express guaranty of prior endorsements amounts to a warranty that the signature of the payee was not forged, but genuine. Branch of that warranty, we said, by presenting a check on which the payee's signature is a forgery, gives the government a right to recover from the guarantor when payment is made. * * * [*Id.* at 456, 65 S.Ct. at 355.]

Thus, it is well recognized that presenting banks and endorsee banks guarantee to the Treasury that all prior endorsements on checks are genuine.

Accordingly, judgment is entered for the United States against the Bank of America National Trust and Savings Association for $34,802.50, and against the Security Pacific National Bank and the Security National Bank jointly for $15,000.

In conclusion, as set forth above, plaintiffs' motion for summary judgment is granted and judgment is entered for plaintiffs in the sum of $49,802.50

against the defendant. Also, defendant's motion for summary judgment is granted as set forth above and judgment is entered in favor of defendant against the Bank of America National Trust and Savings Association for $34,802.50, and against the Security Pacific National Bank and the Security National Bank jointly, for $15,000.